UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                                 Case No. 07-CR-82

EDGARDO GONZALEZ, JR.,

      Defendant.

**RECOMMENDATION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

**I. PROCEDURAL BACKGROUND**

On April 3, 2007, a grand jury sitting in the Eastern District of Wisconsin returned a four-count indictment against Edgardo Gonzalez, Jr. ("Edgardo Gonzalez" or "Gonzalez"). Count One of the indictment charges Gonzalez with knowingly and intentionally possessing with the intent to distribute a mixture and substance containing 50 grams or more of cocaine base in the form of "crack cocaine," a Schedule II controlled substance, in violation of Title 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A). Count Two charges Gonzalez with knowingly and intentionally possessing with the intent to distribute a controlled substance involving a mixture and substance containing marijuana, a Schedule I controlled substance, in violation of Title 21 U.S.C. § 841(a)(1) and § 841(b)(1)(D). Count Three charges Gonzalez with knowingly possessing firearms in furtherance of the drug trafficking crimes charged in Counts One and Two, in violation of Title 18 U.S.C. § 924(c)(1)(A)(i). Count Four charges Gonzalez, as a person previously convicted of a crime punishable for a term exceeding one year, with knowingly possessing firearms which, prior to his possession of them, had

been transported in interstate commerce, in violation of Title 18 U.S.C. § 922(g)(1) and § 924(a)(2). Gonzalez has entered a plea of not guilty to all counts.

On May 17, 2007, Gonzalez filed a motion to suppress physical evidence and statements and a request for an evidentiary hearing. On June 14, 2007, an evidentiary hearing was conducted with respect to the defendant's motion to suppress. Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, the defendant's motion to suppress is now fully briefed and is ready for resolution. For the reasons which follow, it will be recommended that the defendant's motion to suppress be denied.

## II. FACTUAL BACKGROUND

Two witnesses testified at the evidentiary hearing on June 14, 2007: Sergeant Steven Herrmann for the government and Iris Gonzalez for the defendant. The following is a brief summary of the testimony offered at the evidentiary hearing conducted on June 14.

**A. Steven Herrmann**

Milwaukee Police Department Sergeant Steven Herrmann ("Herrmann") testified that he has been with the Milwaukee Police Department for 11 years. He has been involved in approximately 500 to 600 drug investigations. (Tr. at 7.)

On February 14, 2007, at approximately 9:40 p.m., Herrmann went to 2131 West Maple Street to conduct a knock and talk narcotics investigation at that address. Herrmann was with three other officers, Detective Britt Kohnert ("Kohnert"), and two other officers from another district. All the officers, including Herrmann, were in plain clothes. The building at 2131 West Maple Street is a single family two story house. (Tr. at 7-8.)

2

Herrmann and Kohnert knocked on the front door of the residence, but heard no answer. They then went to the back door and knocked, and the door was answered by Iris Gonzalez. They identified themselves as Milwaukee police and told Ms. Gonzalez that Edgardo Gonzalez was in custody and that they were there for a narcotics-related investigation. Ms. Gonzalez was very cooperative. (Tr. at 10.)

Ms. Gonzalez told the officers to come into the residence. The officers and Ms. Gonzalez went down the stairwell and into the kitchen area. The officers told Ms. Gonzalez that they were requesting to look around the residence for any further narcotics. Ms. Gonzalez's mother came downstairs as the officers were speaking with Ms. Gonzalez. The officers asked the mother whether Gonzalez paid rent there, and the mother responded that he did not. Both Ms. Gonzalez and her mother told the officers that Gonzalez lived at the residence. (Tr. at 11-13.)

The officers asked Ms. Gonzalez and her mother to show them where Gonzalez's room was located. The officers followed Ms. Gonzalez and her mother up the stairs. Gonzalez's room was down the hallway at the top of the stairs, on the east side. (Tr. at 14-15.)

As the officers came closer to Gonzalez's room, Herrmann could start to smell marijuana. Ms. Gonzalez opened up the doors to Gonzalez's room. The door to Gonzalez's room was "like two closet doors, two knobs on it, like [] accordion style doors." There was no lock on the doors. The officers did not instruct Ms. Gonzalez to open the doors. (Tr. at 15-16.)

After Ms. Gonzalez opened the doors, she said something to the effect of "enough said," put her hands up in the air, and turned around. The officers then walked up to the door and made some observations. (Tr. at 16.) The light was on in the room. (Tr. at 18.)

Standing outside the room, Herrmann could see a clear plastic bag, with several individually wrapped packages of marijuana inside, on top of the bed located in the southeast corner of the room. Herrmann also saw a Nike shoe box and a scale next to the bag of marijuana. (Tr. at 19.)

Herrmann and Kohnert went into Gonzalez's room. Kohnert directed Herrmann's attention to the top of the dresser, where there was a scale and some cocaine on top of the scale. (Tr. at 21.) Herrman took a flashlight and looked into the small holes on the ends of the shoe box, and saw some plastic baggies inside the box which appeared to contain contraband. Herrmann opened the shoebox and saw some cocaine and marijuana, and also a scale. (Tr. at 23.) Herrmann then closed the box, but later opened the box to show Ms. Gonzalez and her mother the contents of the shoebox. (Tr. at 24.)

At no point did Ms. Gonzalez or her mother ask Herrmann or Kohnert to leave. (Tr. at 24.)

Herrmann secured the room, and Kohnert recovered the marijuana and cocaine on top of the dresser to take down to the vice control division to test. Herrmann and Kohnert did not look through the room any further as Kohnert was recovering the items. (Tr. at 26.)

Approximately 15 to 20 minutes after the initial discovery of the drugs, Kohnert and Herrmann decided to obtain a search warrant. Herrmann stayed in Edgardo Gonzalez's room and in the hallway while the search warrant was being obtained, which took about two to three hours. The search warrant was signed around 12:30 a.m., and executed around 1:00 a.m.[1] No officers manipulated objects in the room prior to the execution of the search warrant. (Tr. at 28.) Herrmann

---

[1] The parties also agreed that, upon completion of the search warrant investigation, Edgardo Gonzalez was interviewed by Detective Warren Allen at approximately 3:30 a.m. Detective Allen confronted Gonzalez with what was uncovered pursuant to the search warrant, at which time Gonzalez provided an incriminating statement. (Tr. at 133-134.)

4

was not sure what items were recovered when the search warrant was executed, but he believed that several firearms, the items in the shoebox, and other narcotics were recovered. Herrmann was present while the search warrant was executed. (Tr. at 29.)

On cross-examination, Herrmann testified that he was aware that Gonzalez was 22 years of age on February 14, 2007. Herrmann also was aware that around 9:00 p.m., Gonzalez was arrested in the rear alley of 2126 West Orchard Street for operating a motor vehicle while suspended, and for conspiracy to deliver to deliver cocaine. At that time, Gonzalez provided his home address, which was 2131 West Maple Street.[2] (Tr. at 30-31.)

Herrmann was shown a series of photographs depicting the 2131 West Maple Street residence. Herrmann testified that in order to get to the rear entryway, he had to go through a cyclone fence and make his way through a gangway. (Tr. at 32; Ex. 2.) The gate was latched but not locked. (Tr. at 36.)

Herrmann testified that he was asking Ms. Gonzalez and her mother for permission to look around the house so that he would not have to secure a search warrant. (Tr. at 38.) Herrmann believed that he had received consent from a person authorized to allow him to walk into and look around Gonzalez's bedroom. (Tr. at 40.) Herrmann asked, prior to getting consent to search,

---

[2] Prior to the taking of testimony at the evidentiary hearing, the parties stipulated to certain facts. The parties agreed that on February 14 Edgardo Gonzalez was the target of an attempted controlled buy of $60 worth of cocaine base in the rear alley of 2126 West Orchard Street in Milwaukee. At approximately 9:00 p.m., Gonzalez was arrested in the rear alley for operating a motor vehicle with a suspended license and for conspiracy to deliver cocaine. A phone was recovered from Gonzalez that matched the number dialed by the citizen participating in the attempted controlled buy. Gonzalez provided to police his address, 2131 West Maple Street in Milwaukee. (Tr. at 3.)

5

whether Gonzalez paid rent in order to see if Gonzalez had standing within the residence. (Tr. at 41.) Other than asking whether Gonzalez paid rent, Herrmann did not ask other questions to determine who had authority to allow him into Gonzalez's room. (Tr. at 42.)

Herrmann stopped and looked into the room at the threshold of the door, rather than simply just walking in, because there was no reason for him to enter a room with which he was not familiar. This pause was for a matter of moments before he walked into the room. (Tr. at 53.) Herrmann did not go into any of the other upstairs rooms other than Gonzalez's room. (Tr. at 47.)

Herrmann testified that Kohnert made the decision to freeze the scene and get a search warrant before searching the room further. Herrmann searched the Nike shoe box because of its particular proximity to the marijuana which was in plain view. (Tr. at 59.)

Herrmann was aware that Kohnert, in his report, did not include a description of Herrmann's looking through the holes of the shoe box and then opening the shoe box. (Tr. at 63.) Herrmann looked through the holes of the box first rather than simply opening the box because he did not want to "immediately run into things." (Tr. at 69.)

Herrmann testified that a search warrant was procured "to be safe." He discussed getting a search warrant with Kohnert, and agreed that obtaining the search warrant was the best way to go. Herrmann had concerns with the consent. (Tr. at 71-72.)

Herrmann testified that only personal property of Gonzalez was recovered from Gonzalez's room. (Tr. at 72.)

On re-direct, Herrmann testified that the doors to Gonzalez's room did not have a lock or a sealing mechanism. The doors could be pulled open without having to turn a knob. (Tr. at 75.)

Herrmann also testified that he has been involved in upwards of 200 consent searches, and that there have been times when the people from whom he obtained consent subsequently changed their story. This factors into his decision as to whether to obtain a search warrant. (Tr. at 77.)

**B. Iris Gonzalez**

Iris Gonzalez testified that she is 23 years old, and lived at 2131 West Maple Street in February 2007 with her mother, father, daughter, and brother Edgardo Gonzalez. She works as a customer service representative. (Tr. at 80-81.)

On February 14, 2007, Ms. Gonzalez heard a knock on the front window, and asked who was there. She heard "police," and went out the back door. She encountered four or five plain clothes officers around the corner of the back stairs, outside the back door. The officers asked who she lived with at the residence, and she responded that she lived there with her mother, father, and brother. Ms. Gonzalez told the officers that her brother was Edgardo Gonzalez, and that he was not present at the house. (Tr. at 82-83.)

The officers asked if they could go into the house, and Ms. Gonzalez said "sure" and led them in. Ms. Gonzalez asked to see identification from the officers once they were inside the house, and they showed her the badges around their necks. At this point there were only two officers in the kitchen. Ms. Gonzalez asked the officers what the situation was about, and they told her it was about her brother Edgardo, and that he was in custody for drugs. (Tr. at 83, 86-87.)

The officers asked Ms. Gonzalez where Edgardo Gonzalez's room was located, and she told them it was upstairs. Ms. Gonzalez asked if they had a search warrant, and the officers responded that they did not need a search warrant because they did not intend on searching the room. Ms.

7

Gonzalez then started to lead the officers upstairs, at which point Ms. Gonzalez's mother appeared at the top of the stairs. (Tr. at 88-89.)

Ms. Gonzalez told her mother that Edgardo was in trouble, and that the officers would like to see where his room is located. The mother said "sure," and went to grab a robe. (Tr. at 90.)

Ms. Gonzalez led Herrmann and Kohnert to the second floor. She motioned to where Edgardo Gonzalez's room was located. The doors were closed. (Tr. at 93.)

Ms. Gonzalez opened the left side of the door. The other side of the door was broken, as it was unhinged and would fall off if opened. Ms. Gonzalez could not remember if the officers asked her to open the door. At the time she opened the door, the officers were behind her on the right side. (Tr. at 93.)

Ms. Gonzalez looked into the room from the doorway and saw the bag of marijuana and the shoe box next to it. She put her hands up and said "enough said." One of the officers asked her what she meant when she said "enough said," and Ms. Gonzalez told the officer that she said "enough said" because she now understood why the officers were at the residence. (Tr. at 98.) The lights were on in the room. (Tr. at 99.)

Ms. Gonzalez walked out of the doorway, and she thought the officers were going to talk to her. Instead, the officers walked into the room. (Tr. at 98.) Kohnert was shining a flashlight in the closet, and Herrmann went to the marijuana and shoe box on the bed. Herrmann opened the shoe box, responded by saying "whoa, whoa, whoa," and closed it. (Tr. at 101.) Herrmann then asked Ms. Gonzalez if she would like to take a look. Ms. Gonzalez walked over and opened the shoe box. She did not see Herrmann looking through the holes of the shoe box prior to his opening it. (Tr. at 102, 105.)

8

Ms. Gonzalez's mother then appeared at the doorway, and the officers asked her if Edgardo Gonzalez paid rent or worked. The mother responded that he did not. The officers also asked Ms. Gonzalez and her mother whether they ever had access to the room. Ms. Gonzalez and her mother said no. (Tr. at 106-7.)

The officers informed Ms. Gonzalez that a detective was going to take some pictures, and that they were going to get a search warrant. Up to this point, the officers had not asked Ms. Gonzalez whether she would give consent to search. (Tr. at 109-110.) Edgardo Gonzalez's room was in the same condition as it was prior to the officers' entry into the room. (Tr. at 111.)

Ms. Gonzalez watched part of the execution of the search warrant. Officers were "tearing the room apart," which was quite different from what she observed when Herrmann and Kohnert were first looking around the room with flashlights. (Tr. at 114.)

On cross-examination, Ms. Gonzalez testified that she was scared when she first encountered the four officers outside the house, because she did not know why they were there. The officers did not act threatening. (Tr. at 120.)

Ms. Gonzalez interpreted the officers' question of whether they could see the room to essentially mean whether they could search the room. The officers told her they just wanted to see where the room was located and keep the process as low as possible. Ms. Gonzalez took their word that they just wanted to see where the room was located. (Tr. at 123-4.) She did not protest when the officers entered his room. (Tr. at 128-129.)

Ms. Gonzalez testified that she was not surprised that the light was on in Edgardo Gonzalez's room because he often left the lights on when he was not around the residence. The light was visible when the doors were closed. Edgardo Gonzalez always closed his door. (Tr. at 126.)

Ms. Gonzalez stated that she does not go into her brother's room when he is not around. The only time she enters the room is when her daughter enters the room, and she has to go inside to take her out of the room. Ms. Gonzalez does not enter her brother's room because he does not like people invading his privacy. The family does not invade each other's privacy, and are like "four strangers living in a house." (Tr. at 130.)

Ms. Gonzalez testified that the officers were fairly friendly from the beginning. (Tr. at 132.)

### III. DISCUSSION

Gonzalez argues that neither Ms. Gonzalez nor her mother had actual or apparent authority to consent to a search of the shoe box. Gonzalez contends that because the search warrant was obtained based on an unlawful search of the shoe box, the physical evidence recovered during the execution of the search warrant, namely cocaine in the shoe box and firearms in the dresser, must be suppressed. Moreover, Gonzalez argues that his custodial statement must be suppressed because his confrontation with the evidence seized pursuant to the search warrant caused him to provide the statement.

"Although the Fourth Amendment generally prohibits searches and seizures performed without a warrant, there is an exception when someone with actual or apparent authority consents to the search or seizure." *United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir.1998). Consent to a search may be obtained from any person who has common authority over the property. *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000). Furthermore, whether a person has common authority is based on "mutual use of the property by persons generally having joint access or control for most purposes . . . ." *United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974). The government has the burden of establishing that the person giving consent had the required common authority to

10

do so. *Denberg*, 212 F.3d at 991 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). The government also bears the burden of proving that the consent was voluntary. *United States v. Evans*, 27 F.3d 1219, 1230 (7th Cir. 1994) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

The government argues that Ms. Gonzalez and her mother had apparent authority to consent to a search of the room and shoe box. "To assess whether apparent authority exists, 'one must look for indicia of actual authority.'" *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir. 1992) (quoting *United States v. Miller*, 800 F.2d 129, 134 (7th Cir. 1986). A warrantless entry is constitutional when "consented to by a third party whom the police, at the time of the search, reasonably believed to have common authority over the premises, even though the individual in fact did not possess such authority." *Id.* at 736 (citing *Rodriguez*, 497 U.S. at 188). A "determination of consent to enter must 'be judged against an objective standard.'" *Rodriguez*, 497 U.S. at 188. Specifically, the standard is whether a man of reasonable caution, under the facts available to the officer at the moment, would believe that the consenting party had authority over the premises. *Id*.

As an initial matter, I am satisfied that the officers, given the facts available to them, had a reasonable belief that Ms. Gonzalez and her mother had the authority to consent to the entry into Edgardo Gonzalez's room. The officers knew that Gonzalez did not pay rent, and that he lived at the residence with his family. Both Gonzalez's mother and sister willingly agreed to show the officers where his room was located. The Seventh Circuit has held that "[a] third-party consent is also easier to sustain if the relationship between the parties . . . is especially close." *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997).

Of particular note, the uncontradicted evidence is that Ms. Gonzalez opened the unlocked door to Gonzalez's room without instructions to do so from the officers. Moreover, Ms. Gonzalez

11

looked into the room, saw the evidence on the bed, and told the officers that she understood why they were at the residence. Given these actions, a reasonable person would believe that Ms. Gonzalez had the authority to access Gonzalez's room.

Gonzalez argues that, even if there was lawful consent to look around the bedroom, the officers did not have consent to search the shoe box in the bedroom. *See United States v. Rodriguez*, 888 F.3d 519, 523 (7th Cir. 1989) (a general consent to enter a room does not imply that officers can also search a closed container within the room). However, even if the officers lacked consent to search the shoe box, Sgt. Herrmann would still have been able to lawfully search the shoe box if its contents were in plain view. Gonzalez does not contest that the officers had the right to enter the doorway and observe the evidence in plain view. Gonzalez also does not contest that the officers then had the right to enter the room and seize the evidence in plain view, namely the marijuana on the bed and the cocaine and scale on the dresser.

According to Herrmann's testimony, prior to opening the shoe box, he looked through the holes of the shoe box using a flashlight and observed contraband inside. Under such circumstances, the items inside the shoe box would constitute evidence which was in plain view. However, there is a discrepancy in the testimony as to whether Herrmann actually looked through the holes of the shoe box prior to opening it.

Regardless, even if Sgt. Herrmann lacked the lawful authority to search the shoe box, either due to a lack of consent or because its contents were not in plain view, the contents of the shoe box would still be admissible under the independent source doctrine.[3] The independent source doctrine

---

[3] The independent source doctrine is more applicable to this case, rather than the closely related "inevitable discovery" doctrine, because the contents of the shoe box were not recovered under the allegedly illegal search, but instead were recovered later as part of the lawful execution

allows for "the introduction of evidence discovered initially during an unlawful search if the evidence is discovered later through a source that is untainted by the initial illegality." *United States v. Markling*, 7 F.3d 1309, 1315 (7th Cir. 1993) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988).

A determination of whether the search of Gonzalez's room pursuant to the search warrant was a genuinely independent source of the evidence found in the shoe box depends on two factors. The first factor is "whether the illegally obtained evidence affected the magistrate's decision to issue the search warrant." *Markling*, 7 F.3d at 1315. The second factor is whether the officer's "decision to seek the warrant was prompted by what he had seen" during the illegal search. *Id*.

I am satisfied that the ultimate "discovery" of the contraband in the shoe box occurred by virtue of a source which was untainted by any alleged prior illegality, that untainted source being the search warrant. As to the first factor, the information used to support the application for the search warrant was based on the officers' observations, made from outside of Gonzalez's room, of evidence in plain view. The search warrant affidavit did not contain reference to any of the observations made by Sgt. Herrmann when he opened the shoe box. (Ex. B.) As stated by the Seventh Circuit, "a search warrant procured in part on the basis of illegally obtained information will still support a search if the untainted information supporting the warrant, considered alone, is sufficient to establish probable cause." *Markling*, 7 F.3d at 1316. The cocaine, digital scale, and marijuana that were in plain view and which were recovered by the officers provided a substantial basis for a judicial officer to conclude that probable cause existed.

---

of the search warrant. Under the inevitable discovery doctrine, "evidence unlawfully obtained is admissible if the evidence would have been inevitably discovered by lawful means." *United States v. Johnson*, 22 F.3d 674, 683 (7th Cir. 1994).

13

With regards to the second factor, there is no indication that the officers decided to seek a search warrant based on Sgt. Herrmann's discovery of contraband inside the shoe box. As noted above, the officers had already seen a variety of contraband in the room prior to the opening of the shoe box. The opening of the shoe box did not first alert the officers to the presence of drugs in the room.

Moreover, the tentative actions of Sgt. Herrmann and Det. Kohnert when entering the room suggest that they contemplated obtaining a search warrant to allow for a more thorough search prior to entering the room. Sgt. Herrmann testified that they decided to obtain a search warrant just to be safe and because he was concerned with Ms. Gonzalez's and her mother's consent. Consistent with this expressed concern, the officers' actions suggest that they did not want to extend the search beyond the items that were not in plain view from the outside of the room. Although Sgt. Herrmann did open the shoe box, he did so because of its proximity to the contraband on the bed. As noted by Ms. Gonzalez's testimony, the actions of the officers in their initial search of the room was markedly different than when the search warrant was executed and officers were "tearing the room apart." (Tr. at 114.)

Simply stated, the contents of the shoe box were ultimately seized by way of an untainted source, namely a lawfully executed search warrant. Such being the case, even if the contents of the shoe box were initially discovered unlawfully, the contents are nevertehless still admissible under the independent source doctrine. Moreover, because the search warrant was untainted, the other evidence discovered pursuant to the warrant, specifically the firearms, are also admissible. Finally, because the evidence seized by virtue of the search warrant is admissible, the statements made by Gonzalez as a result of being confronted with this evidence are also admissible.

In conclusion, and for all of the foregoing reasons, it will be recommended that Gonzalez's motion to suppress be denied.

**NOW THEREFORE IT IS RECOMMENDED** that Gonzalez's motion to suppress evidence be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 2nd day of July 2007, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge