UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                            Case No. 07-CR-82

EDGARDO GONZALEZ, JR.,

        Defendant.

_____

## ORDER

On April 3, 2007, a federal grand jury sitting in the Eastern District of Wisconsin returned a four-count indictment charging Edgardo Gonzalez, Jr. ("Gonzalez") with knowingly and intentionally possessing cocaine base and marijuana with the intent to distribute in violation of 18 U.S.C. § 841 (Counts One and Two); knowingly possessing a firearm in the furtherance of drug trafficking activities in violation of 18 U.S.C. § 924 (Count Three); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922 (Count Four). Gonzalez was arraigned on April 27, 2007, and he pled not guilty to all four counts. On May 17, 2007, Gonzalez filed a pretrial motion to suppress evidence seized on February 14, 2007, during the execution of a search warrant at 2131 West Maple Street in Milwaukee, Wisconsin. Gonzalez's motion also sought suppression of his post-arrest statements. On June 14, 2007, Magistrate Judge William E. Callahan, Jr., held an evidentiary hearing on the motion to suppress, and on July 2, 2007, issued a report

and recommendation that Gonzalez's motion be denied. Gonzalez timely filed objections to the recommendation, and the government has filed a response.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B), a magistrate judge may consider dispositive motions, such as motions to suppress, and issue recommendations to the district judge regarding the motions. *See id.* When a party objects to a magistrate's findings, the district court judge must make *de novo* determinations as to these findings. *See id.* § 636(b)(1)(C); *see also Delgado v. Bowen,* 782 F.2d 79 (7th Cir. 1986). The district court may adopt the recommendation in part or in its entirety and has the final authority of judgment in the case. *Delgado*, 782 F.2d at 82. For the reasons set forth below, the court will adopt Magistrate Callahan's recommendation in part and deny Gonzalez's motion to suppress.

## BACKGROUND

The following facts represent a brief summary of the June 14, 2007 evidentiary hearing. Two witnesses testified: Sergeant Steven Herrmann from the Milwaukee Police Department for the government, and Iris Gonzalez, Gonzalez's sister, for the defense.

## I.    Milwaukee Police Department Sergeant Steven Herrmann

Sergeant Steven Herrmann ("Herrmann") testified that he has been employed by the Milwaukee Police Department for approximately 11 years, and during this time he has been involved with up to 600 drug investigations. (June 14, 2007 Evidentiary

Hearing Transcript 7) (hereinafter "Tr.") Herrmann testified that he was on duty on the evening of February 14, 2007, and participated in a narcotics "knock and talk" investigation at 2131 West Maple Street in Milwaukee, Wisconsin. Herrmann was accompanied by Detective Britt Kohnert ("Kohnert") and two other officers; all four were dressed in plain clothes attire. (Tr. 7-8.)

Herrmann described the residence at 2131 West Maple as a single family two-story home. When the officers arrived, they knocked on the front door, and when they heard no response, they proceeded to the back door of the residence. A female later identified as Iris Gonzalez ("Ms. Gonzalez") answered the door. (Tr. 10.) The officers identified themselves and informed Ms. Gonzalez that they were there for a narcotics related investigation. Herrmann described Ms. Gonzalez as "very, very cooperative," and stated she did not seem surprised by their comments that Gonzalez was the subject of a narcotics investigation. (Tr. 10.)

Herrmann, Kohnert, and Ms. Gonzalez proceeded down the stairwell of the entryway to the home and entered the kitchen. The officers asked her if they could look around the residence for narcotics and Herrmann testified Ms. Gonzalez said, "sure, not a problem." (Tr. 12.) Then, she got her mother who shortly thereafter came down the stairs. (Tr. 13.) Gonzalez's mother also said it was fine if the officers looked around the home, and the women led them up an adjacent stairwell to other areas of the house. At this point the officers also questioned Gonzalez's mother as to whether or not he paid rent, and she answered that he did not. (Tr. 13.)

-3-

The officers asked and were directed towards the area of the residence where Gonzalez stayed. Herrmann stated that to access his bedroom, they had to ascend a stairwell, and Gonazlez's room was at the most-easterly side of a landing at the top of the stairwell. (Tr. 14-15. ) Herrmann testified that he smelled marijuana at the top of the landing, particularly on its east side. Herrmann described the doors leading into the room as accordion-styled double doors that were closed but not locked. (Tr. 14-15.) Herrmann testified that Ms. Gonzalez opened the doors up without any prompting from the officers. (Tr. 15-16.) Shortly after Ms. Gonzalez opened the doors, Herrmann said she threw her hands up in the air and made a comment to the effect of, "enough said." (Tr. 16.)

At this point, Herrmann stated that from outside the room, he observed marijuana on top of the bed, which was located on the southeast corner of the bedroom. Herrmann stated the marijuana was on the end of the bed, and it was a single package with several individually wrapped marijuana packages inside a plastic bag. Adjacent to the marijuana was a Nike shoe box and a scale. (Tr. 16-19.)

Herrmann testified that Kohnert observed and directed his attention towards cocaine and a scale on top of a dresser in the room. The dresser was located on the easterly side of the room. Herrmann then directed his attention towards the Nike shoe box. He testified that the box was a standard shoe box, and was orange and brown in color, with two manufactured holes at each end of the box. (Tr. 22-23.) Herrmann stated that during his initial observation of the box, he was not able to see

-4-

inside it; however, when he examined the box with a flashlight, he was able to observe plastic baggies inside the box through the holes on the side. Herrmann believed this to be contraband and opened the box. (Tr. 22.)

The officers showed Gonzalez's mother and sister the items that were found and secured the room. The items of evidentiary value were then recovered and inventoried; the officers ceased looking through the room and did not manipulate anything else in the room. (Tr. 25-26.) After approximately 15 to 20 minutes, the officers decided to obtain a search warrant. Herrmann remained at the home while Detective Kohnert obtained the search warrant, a process he testified took two to three hours. (Tr. 26-27.) At approximately one o'clock in the morning, the search warrant was executed. (Tr. 28.) Herrmann did not participate in the execution of the search warrant, nor did he assist in recovering any of the evidentiary items. Other narcotics and several firearms were recovered during the search, including the items in the Nike shoe box. (Tr. 28-29.)

On cross-examination, Herrmann testified that Gonzalez was arrested in the alley outside of the residence and was asked to provide his home address. Herrmann was also shown a series of photographs depicting the exterior and the interior of the residence at 2131 West Maple Street. (Tr. 30-31.) Herrmann also stated that it was his intent to ask Gonzalez's mother and sister for permission to search the house to obviate the need for a warrant; both provided him with permission to search. (Tr. 38.) Herrmann stated that he asked Gonzalez's sister and

-5-

mother questions about rent payment to ascertain whether or not they had the authority to authorize a search of his room. Herrmann testified that he did not recall any other questions that were asked of Gonzalez's sister or mother in regard to their authority over Gonzalez's bedroom. (Tr. 41-42.)

On re-direct examination, Herrmann testified that doors to Gonzalez's room were not locked. He also testified that he had been involved in approximately 200 consent searches, and there have been times when the persons giving the consent to search have subsequently changed their story; this is a factor that weighs in his decision to obtain a search warrant. (Tr. 77.)

## II.     Iris Gonzalez

Ms. Gonzalez testified that she is the defendant's sister and lives with him, their parents, and her three-year-old daughter at the 2131 West Maple Street residence.  (Tr. 80-81.) She stated she was at home the evening of February 14, 2007.  At approximately 9:30 p.m., she heard a knock near the front window and the individuals outside the residence identified themselves as "police." She proceeded out the back door of the residence and met the officers outside. The officers asked her who she was and who lived at the home; she informed them accordingly. Thereafter, they asked her if they could come inside and she led them in. (Tr. 82-83.)

Once inside, they all proceeded into the kitchen area of the home and Ms. Gonzalez asked to see identification and the officers showed her badges around their necks.  At this time, there were only two officers inside the home, and they

-6-

informed Ms. Gonzalez that they were there in relation to a narcotics charge involving her brother. (Tr. 83; 86-87.)

The officers asked where Gonzalez's room was located, and Ms. Gonzalez told them it was upstairs. She then inquired into whether they had a search warrant, and the officers informed her that it was not necessary to have one because they would not be searching. Ms. Gonzalez's mother, Jesusa Gonzalez, then appeared at the top of the stairs. Ms. Gonzalez's mother also indicated that it would be alright for the officers to see where Gonzalez's room was located. (Tr. 90-93.)

When they reached Gonzalez's room, Ms. Gonzalez opened the left side of the doors to the room, but she testified that she did not remember if she opened it on her own accord or was asked by the officers to do so. (Tr. 93.) When Ms. Gonzalez looked into Gonzalez's room, she could see a bag of marijuana with a shoe box next to it. When she saw these items, she threw her hands up in the air and said, "enough said." The officers asked her to clarify her comment, and she responded that she now understood why they were at the residence. (Tr. 98-99.)

The officers entered the room, and Kohnert shined his flashlight into the closet and Herrmann headed towards the marijuana and Nike shoe box. (Tr. 98.) Ms. Gonzalez said Herrmann opened the shoe box, and made an exclamation. She asked what was inside the box, and he asked her if she wanted to look inside it. (Tr. 102-05.)

-7-

Ms. Gonzalez then stated that her mother appeared in the doorway, and the officers asked her if Gonzalez paid rent or worked. Her mother responded that he did not. Ms. Gonzalez said the officers also asked her if they had access to his room, and both she and her mother responded that they did not. (Tr. 106-7.) The officers informed Ms. Gonzalez that they would be taking some pictures of the room and that they were going to get a search warrant. Ms. Gonzalez watched for awhile during the execution of the search warrant and described the officers as "tearing the room apart, " which was in stark contrast to Herrmann and Kohnert simply looking around the room with their flashlights. (Tr. 114.)

On cross-examination, Ms. Gonzalez stated that she interpreted the officers' questions about seeing Gonzalez's room as them asking if they could search his room. She said that they did not protest when the officers entered his room. (Tr. 126.) She also testified that she was not surprised to see the light left on in Gonzalez's bedroom, because he often did this, even if he was not at home. She said that he always kept his door closed, and she does not go into his room. The only time she ever does go into his room is when her toddler-aged daughter enters the room. Ms. Gonzalez stated that her brother likes his privacy and the family is like "four strangers living in a house." (Tr. 130.)

III.    **Evidence**

During the evidentiary hearing, the defense offered seven photographs into evidence, and each depicted the outside and inside areas of the residence at

2131 West Maple. (*See* Defense Exhibits 1-7.) As part of his objection, Gonzalez offered a Nike shoe box (marked as Exhibit 100) similar to the one depicted in defense Exhibit Six. Although this exhibit was not offered during the evidentiary hearing, the court receives Exhibit 100 into evidence for the purposes of adjudicating Gonzalez's suppression motion.[1]

## ANALYSIS

Gonzalez raises four objections to the magistrate's recommendation. First, he argues that his mother and sister did not have the requisite apparent authority to consent to a search of Gonzalez's bedroom. Next, Gonzalez argues that the cocaine base contained inside the Nike shoe box was not in plain view. Third, he argues that the cocaine base in the shoe box and the seizures made pursuant to the search warrant must be suppressed because the independent source doctrine does not apply. Finally, Gonzalez argues that his custodial statements must be suppressed because they were influenced by the unlawfully seized evidence. The court will separately address each of his objections below.

## I.    Authority to Consent to Search

Ordinarily, the Fourth Amendment prohibits warrantless searches of an individual's home; however, this prohibition does not generally apply when law enforcement officials receive voluntary consent to search. *Schneckloth v.*

---

[1]The court provided the government with the opportunity to examine the shoe box, and the government did not object to its admission informally or in its written response.

*Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Grap*, 403 F.3d 439, 442 (7th Cir. 2005). Under certain circumstances, this consent to search may be supplied by a third-party. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). A third-party with common authority over the premises sought to be searched may provide valid consent, either through actual or apparent authority. *United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir. 1998) (citing *Schneckloth*, 412 U.S. at 222 (1973)). It is the government's burden to show actual or apparent authority. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

Common authority exists when the government demonstrates that the third-party providing the consent to search "enjoys mutual use of the property, either by having joint access or control over the property for most purposes," such that "it is reasonable to recognize that any of the co-habitants has the right to permit to the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Alternatively, some circuits have adopted the approach that a close relationship between the parties, such as a parent-child relationship, creates a rebuttable presumption of control over the property. *See United States v. Rith*, 164 F.3d 1323, 1330 (10th Cir. 1999) (noting "[r]elationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships). The Seventh Circuit has not squarely determined that a parent-child relationship gives rise to a rebuttable presumption of control over the

-10-

property, *see United States v. Corley*, 342 F. Supp. 2d 776, 780 (N.D.Ind. 2004); however, the Seventh Circuit has held that such a presumption is appropriate in a husband-wife relationship. *See United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) (holding "a spouse presumptively has authority to consent to a search of all areas of the homestead"). Thus, if the presumption were to apply, the relationship alone could establish that there was actual authority to consent to the search. *See Rith*, 164 F.3d at 1330-31.

Additionally, the Seventh Circuit has upheld the validity of consensual searches in the context of a parent-child relationship, noting "third-party consent is also easier to sustain if the relationship between the parties-parent to child here, spouse to spouse in other cases-is especially close." *United States v. Ladell,* 127 F.3d 622, 624 (7th Cir. 1997). Furthermore, district courts sitting in the Seventh Circuit have held that this presumption applies when a parent consents to the search of a live-in child's bedroom. *See Corley*, 342 F. Supp. 2d at 779 (stating "[t]wo kinds of family relationships give rise to a rebuttable presumption of control over property for most purposes: (1) parent-child relationships; and (2) husband-wife relationships").

While the court notes application of the presumption flowing from relationships to be both compelling and sensible, the issue of Gonzalez's mother's and sister's apparent authority to search is best determined without the necessity of reaching the question of whether the presumption should be applied here. More to the point,

Case 2:07-cr-00082-JPS   Filed 09/20/07   Page 11 of 24   Document 38

even if the court were to apply the presumption, Gonzalez appears to be able to rebut its application. Stated another way, there are facts in the record that raise significant questions about whether Ms. Gonzalez and her mother had actual authority to search, and it is of little consequence if this comes as a rebuttal or if the court plainly finds there was not actual authority to search.

Courts have discussed circumstances that would undermine an actual authority to search, or rebut the presumption of control in close relationship. If the defendant demonstrates a desire to restrict access to his bedroom, or actually cautions others not to enter his bedroom, these are factors that would weigh against a finding that a third-party had the actual authority to consent to a search of the bedroom. *See Corley*, 342 F. Supp. 2d at 781 (suggesting that evidence showing a defendant cautioned others not to enter his room or restricted access to his room by placing locks on doors or containers within the room would rebut the presumption that a parent had actual authority to consent to a search). As to these factors, this court finds that Gonzalez is able to present evidence that controverts that his sister or mother had the actual authority to consent to a search. First, Ms. Gonzalez testified that the doors to Gonzalez's room were consistently closed. (Tr. 126.) Additionally, Ms. Gonzalez stated that she didn't have access to her brother's room; she would only enter if her three-year-old daughter happened to run into his room. (Tr. 130.) She also testified that Gonzalez "doesn't like anybody invading his privacy [or] anyone going in his room," and that they were like "four strangers living in a

-12-

house." (Tr. 130.) These factors significantly militate against a finding that either Ms. Gonazlez or her mother had the actual authority to consent to a search of Gonzalez's room. The court finds they evidence a desire on behalf of Gonzalez to restrict access to his room, and it also shows that his family members were aware of his desire to do so. Accordingly, the court finds that neither Gonzalez's mother nor sister had the actual authority to consent to a search of his bedroom.

However, and significantly, despite the court finding that there was not actual authority to search, it does find that there was the apparent authority to search, and therefore the police acted upon what they thought was a valid third-party consent. In *United States v. Groves,* 470 F.3d 311 (7th Cir. 2006), the Seventh Circuit provided several examples of factors a court may look to in determining if the individuals providing the consent to search had the apparent authority to do so. *Id.* at 319. These factors include but are not limited to: (1) having a key to the premises; (2) an individual's statement that he or she lives there; (3) documents listing the residence as that person's legal address; (4) keeping clothing or personal belongings at the residence; and (5) paying rent for living at the premises. *Id.* (internal citations omitted). In addition to these factors, to determine whether apparent authority to search exists, the court must also consider whether a "reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched." *Basinski,* 226 F.3d at 834

-13-

(citing *Rodriguez*, 497 U.S. at 188). Accordingly, a determination of apparent authority requires an analysis of both the objective factors and what the officers reasonably and subjectively determined at the time of the search. *See id.*

Clearly, the record established that both Ms. Gonzalez and her mother were full-time residents at the home, and therefore likely had keys to the home, personal belongings at the home, and documents stating that 2131 West Maple Street home was their actual residence. The court finds each of these factors significantly weigh in favor of a finding of apparent authority. Moreover, the record established that the officers did make reasonable efforts and inquiries to determine the living arrangements the parties had with one another, such as asking if Gonzalez paid rent. (*See* Tr. 13; 40-41.) Rent payment can be an important factor in determining third-party consent because such payment could establish a co-tenancy relationship, and thereby undermine the third-party's authority to consent to searches of a roommate's bedroom. *See United States v. Barrera-Martinez*, 274 F. Supp. 2d 950, 962 (N.D. Ill. 2003). Conversely, where the third-party consenting to the search shows that she is responsible for payment of the house's bills, this may indicate she has a greater overall authority to consent to searches of the entire residence. *See Aghedo*, 159 F.3d at 310 (citing *United States v. Chaidez*, 919 F.2d 1193, 1202 (7th Cir.1990), *cert. denied*, 502 U.S. 872, 112 S. Ct. 209, 116 L. Ed. 2d 167 (1991)). Based upon Herrmann's testimony, the court finds that it was entirely reasonable for the officers to conclude that because Gonzalez made no rent payments and that his

-14-

mother and sister were full-time residents of the home, there was an apparent authority for them to consent to a search of his bedroom. Indeed, Herrmann testified:

> Q. Okay. And you believed as a trained law enforcement officer that you had just received consent from a person authorized to allow you to look into the bedroom, correct?
>
> A. Correct.

(Tr. 40.) These comments demonstrate Herrmann subjectively thought he had been given valid third-party consent to search Gonzalez's room. A review of the transcript indicates that Herrmann's testimony was overall coherent, plausible, and truthful. Accordingly, the court determines that there was a factual and subjective basis for a finding of an apparent authority to search Gonzalez's bedroom, and that the officers entered his bedroom acting upon the reasonable belief that they had received valid third-party consent to search it.

However, a consent to search a room does not necessarily include consent to search everything, including closed containers such as the Nike shoe box, located within the room. *United States v. Rodriguez,* 888 F.2d 519, 523 (7th Cir. 1989). In considering containers located within the areas searched, the court must consider the "government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property." *Basinki,* 226 F.3d at 834. Here, the court determines that the government has not met its burden demonstrating that the officers had either actual or apparent authority to

-15-

search containers within Gonzalez's bedroom.

To begin, the evidentiary hearing did not establish any foundation for the court to determine that Ms. Gonzalez or her mother had common authority, control, or even access to Gonzalez's personal effects and containers, namely, his Nike shoe box. If anything, that Ms. Gonzalez had no idea what was inside the Nike shoe box when Herrmann offered to show her its contents shows that she had no control, access, nor authority over it. (*See* Tr. 101-02.) Furthermore, neither witness testified that the officers asked questions about Ms. Gonzalez's or her mother's access to Gonzalez's personal containers. Indeed, a law enforcement officer has a duty to make such inquiries, particularly if it is questionable if the third-party had the requisite authority. *See Montville v. Lewis*, 87 F.3d 900, 903 (7th Cir.1996) (noting an officer's "duty to inquire further as to a third party's authority to consent to a search if the surrounding circumstances make that person's authority questionable"). Finally, the court finds that the characteristics of the container support the conclusion that a reasonable person may be unlikely to believe that Gonzalez freely granted access to it. Although the box was not locked and had no markings making it clearly attributable solely to Gonzalez, when the top of the box was shut, it was all but impossible to view its inside contents and, therefore, since its contents were enclosed and private, it was more akin to a foot locker or briefcase than to an open or clear crate. *See Basinski*, 226 F.3d 834-35 (noting "it is less reasonable for a police officer to believe that a third party has full access to a defendant's purse or a

-16-

briefcase than, say, an open crate").   Accordingly, the court finds that the officers had neither actual or apparent authority to search within the Nike shoe box.

## II.   Plain View

Gonzalez also argues that the evidence within the Nike shoe box is inadmissible and maintains that it would not be possible to observe the contents of the box in accordance with the "plain view" exception standards. The government argues the evidence inside of the box is admissible regardless of the scope of Ms. Gonzalez's consent because its contents could be observed in plain view.

The plain view doctrine is a delineated exception to the warrant requirement, and under certain circumstances, it allows officers to seize evidence in the absence of a search warrant.  *Coolidge v. New Hampshire*, 403 U.S. 443, 464-65 (1971). Under the original application of plain view doctrine, three distinct elements had to be satisfied.   First, the officers must lawfully be on the premises; second, the discovery of the evidence must be inadvertent; and finally, the incriminating nature of the property must be immediately apparent to the officer. *Moya v. United States*, 761 F.2d 322, 327 (7th Cir.1984) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)).  The Supreme Court has since interred the "inadvertence" requirement, *see Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990), and the Seventh Circuit has articulated the following three requirements for the application of a modern plain view doctrine: (1) the officers must be lawfully present in the place from where they viewed; (2) the item must be in plain view; and (3) the

-17-

item's incriminating nature was "immediately apparent." *United States v. Cellitti,* 387 F.3d 618, 623 (7th Cir. 2004) (citing *United States v. Raney,* 342 F.3d 551, 558-59 (7th Cir. 2003)).

Although neither the government nor the defendant provided extensive briefing on these issues, the testimony itself advanced during the evidentiary hearing, together with the Nike shoe box, provide sufficient information for the court to analyze the facts under the plain view doctrine. As discussed above, the officers were lawfully present in the room where the box was located because Gonzalez's mother and sister, acting with apparent authority, had authorized a search of the residence, and more specifically, Gonzalez's room. Accordingly, they have satisfied the first requirement of the plain view exception. *See Cellitti,* 387 F.3d at 623.

The Nike shoe box the court received into evidence was labeled for a size 10½ male shoe. The box measures 12½ inches long, 7½ inches wide, and is 4¼ inches in height.  The holes described earlier are centered along the right and left sides of the box and are approximately 1 inch in diameter and run along the top lip of the box, and cover approximately ½ inch along the top, and ½ along the side. However, due to the way the shoe box is folded, when closed, three layers of cardboard create the hole cut-outs, thereby substantially decreasing one's ability to view the inside contents of the box through the holes.

Upon taking the box into evidence, the court filled it with plastic bags and placed it in a well-illuminated room.  The court then took a flashlight and directed the

-18-

light towards the holes in the box. This experiment was conducted at, below, and above eye-level. The court also did the same in a dimly-lit room. Each time a flashlight was shown through the box, it was extremely difficult to discern what, if anything, was inside it due to the small size of the holes in relation to the box. While it was possible, with patience and a scrupulous eye, to see that there was *something* in the box, its "incriminating nature" was simply not "readily apparent" as required for the plain view doctrine to apply. *See Moya,* 761 F.2d at 325 (noting that the "character of the property must be such as to give the officers 'probable cause to associate the property with criminal activity,'" and continuing that "[t]here is nothing apparently incriminating about a plastic bag.") (citing *Payton v. New York*, 445 U.S. 573, 587 (1980)).

Thus, the court notes that Herrmann's testimony that he was able to see plastic bags inside of the box when its lid was closed is inconsistent with the court's own observations. Furthermore, the court's own finding determine that the incriminating nature of the contents in the box would not be "immediately apparent." More importantly, the court finds that the government has not satisfied the second and third requirements of the plain view exception, that the items were in plain view and the incriminating nature of the property was immediately apparent to the officer. *See Moya*, 761 F.2d at 327. Accordingly, the court finds that the plain view exception does not apply to the Nike shoe box.

-19-

### III.    Independent Source Doctrine

Having found that the officers lacked consent to search the box and, furthermore, that viewing its contents in plain view would not be possible under the circumstances presented, the court must now consider if the "independent source doctrine" applies. Magistrate Callahan determined that it did, and Gonzalez timely objected to this finding.

The independent source doctrine developed "[a]lmost simultaneously with [the] development of the exclusionary rule," and generally states that evidence will be admissible despite the fact that it was "initially discovered during, or as a consequence of, an unlawful search," if it was "later obtained from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988). Stated another way, if officers discover items *x* and *y* during an unlawful search, but later discover item *z* during an independent and legal search, item *z* is admissible because it was derived from an independent source. *Id.* at 537-38; *see also United States v. May,* 214 F.3d 900, 906 (7th Cir. 2000). Furthermore, if during the legal search, the officers rediscover items *x* and *y*, they too are admissible under the doctrine. *Id.* The Court in *Murray* framed the reasoning of the doctrine as a public policy argument and stated the societal interest "in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been if no police error or misconduct had occurred." *Murray,* 487 U.S.

Case 2:07-cr-00082-JPS   Filed 09/20/07   Page 20 of 24   Document 38

at 537 (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). "Thus, the central issue under the independent source doctrine is whether the evidence at issue was obtained by independent legal means." *May*, 214 F.3d at 906.

The Seventh Circuit in *United States v. Markling*, 7 F.3d 1309 (7th Cir. 1993), articulated a two-part test to determine if evidence was obtained through an independent legal source. *Id.* at 1315. First, the court must determine whether the officer's decision to seek a search warrant resulted from what he had seen during the unlawful search; and second, whether the illegally obtained evidence caused the magistrate to issue the search warrant. *Id.*; *see also May,* 214 F.3d at 900.

The following facts were set forth in the sworn affidavit submitted to obtain the search warrant: (1) Detective Britt Kohnert averred that on February 14, 2007, Gonzalez was called and asked to deliver $60.00 of crack cocaine to an individual in the rear alley way of 2126 Orchard Street; (2) Detective Kohnert stated the officers stopped Gonzalez and placed him in custody for conspiracy to deliver cocaine and Gonzalez supplied his home address as 2131 West Maple Street; (3) that the officers went to this address and were allowed entry into the home by Gonzalez's sister and mother; and (5) that the officers observed, in plain view, a green, leafy, plantlike substance suspected to be marijuana on the bed located in the southeast bedroom on the second floor. (Ex. B.) In addition to this information, Kohnert also averred that he observed an off-white chunky substance on top of a digital scale. (Ex. B.) As noted in the court's discussion above, the officers were lawfully in

-21-

Gonzalez's room because they had valid consent pursuant to apparent authority. Therefore, they lawfully observed each of these items set forth in the affidavit to obtain the search warrant, and these facts are certainly sufficient to establish the necessary basis for the issuance of a search warrant absent any reference to the evidence in the Nike shoe box. Accordingly, the court finds that the first prong of the *Markling* inquiry has been met.

As to the second prong of the *Markling* inquiry, the court finds that the decision to issue the search warrant was not influenced by the evidence discovered in the Nike shoe box. Because no information about the drugs or paraphernalia contained within the box was submitted in support of the application, it is clear that the judicial officer's decision to issue a warrant could not have been based upon this evidence. Gonzalez argues that it's significant and to his favor that the application for the search warrant did not contain any information about the items in the Nike box; however, this fact actually works against him. It is readily apparent that the because the application did not refer to the Nike box evidence, there is no way that it caused the judicial officer to issue the warrant based on that information.

Moreover, the court finds Gonzalez's arguments to the contrary unpersuasive. The record does not support Gonzalez's assertions that the causal link between the viewing of the contraband in the shoe box and the decision to obtain a warrant is clear. Rather than speculating as to the officers' motives and their conversations at the residence, the court finds that it is far more appropriate to consider the

information actually contained in the affidavit for a search warrant to determine what prompted the officers' decision to obtain a warrant. Moreover, even if the court would assume *arguendo* that the Nike box evidence's "omission was purposeful," it is still not possible to say the judicial officer's decision to issue the warrant was based upon this illegally viewed evidence because from the information contained in the warrant, he would have been unaware of it.

Therefore, the court finds that both prongs of the *Markling* inquiry are satisfied; there was sufficient information, absent any illegality, to obtain a search warrant, and the evidence in the Nike shoe box did not cause the magistrate to issue the warrant. Accordingly, the court finds that the independent source doctrine, as articulated in *Murray,* is applicable to the present case and because the evidence within the Nike shoe box was later discovered and seized through an independent and legal search, it too is admissible. *See Murray*, 487 U.S. at 537

## IV. Custodial Statements

Lastly, Gonzalez argues that his custodial statements must be suppressed because they were influenced by the illegally seized evidence. Gonzalez cites to *United States v. Jones*, 214 F.3d 836 (7th Cir. 2000), for support for his position that his statements must be suppressed. However, based upon the discussion above and the court's finding that the evidence was not illegally seized, Gonzalez's arguments about his custodial statements are without merit and the court is obliged to deny his motion to suppress them.

-23-

Accordingly,

**IT IS ORDERED** that Magistrate Callahan's Report and Recommendation [Docket # 30] be and the same is hereby **ADOPTED IN PART**; and

**IT IS FURTHER ORDERED** that Gonzalez's motion to suppress [Docket #16] be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin on September 20, 2007.

BY THE COURT:

    s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge

-24-